Luther Walker appeals from his conviction and sentence on a charge of possession of cocaine. For the reasons that follow, the judgment of the trial court will be affirmed.
Walker was indicted on one count of possession of crack cocaine in an amount exceeding ten grams but less than twenty-five grams, in violation of R.C. 2925.11 (A). Walker filed a motion to suppress the evidence of crack cocaine found in his possession. He argued, inter alia, that the discovery of the cocaine resulted from an illegal search and seizure, thereby requiring its suppression.
At the hearing on Walker's motion to suppress, Stephen Lane, a City of Xenia police officer, testified on behalf of the State. Lane testified that on January 30, 1998, he and other police officers were conducting a search of a residence in Xenia pursuant to a search warrant. Drug activity had been suspected at the premises being searched. During the course of the search of the residence, Officer Lane encountered Mr. Walker. Officer Lane testified:
Q. Why don't you explain what happened.
 A. When we first entered the residence, Mr. Walker was not there. We got information that he'd soon be returning. We had an inventory to do. So, we were doing the inventory also anticipating his return He did return. We had information that he would be carrying or possibly could be carrying a weapon. So, when he returned we detained him and patted him down.
Transcript of Motion to Suppress Hearing, April 2, 1998, at p. 6-7.
Officer Lane further testified that the pat-down of Walker was done for the security and safety of the police involved in the investigation. Id., at 8, 22. During the course of the pat-down, Officer Lane detected a piece of crack cocaine in the left lower outside pocket of Walker's black leather jacket. Seeid., at 8, 23, 24, 26. Officer Lane subsequently reached inside the jacket pocket and seized the cocaine.
Officer Lane testified at length concerning the discovery of the cocaine:
 Q. Okay. Now, in Mr. Walker's case, did you feel anything that felt like a weapon to you?
A. No.
 Q. Okay. So, as far as you were concerned from the extent of your pat down search, he was not armed?
A. Correct.
 Q. And you made that determination before you reached inside his pocket, correct?
A. Yes.
 Q. Now, I believe that you gave a statement that indicates that you felt an object inside a cigarette wrapper package, is that correct?
A. Yes.
Q. And that is what you actually felt?
A. Yes.
Q. Okay, you —
A. No, I could not.
 Q. But you're familiar with what a cigarette pack feels like, correct.
A. Yes, I am.
 Q. When you felt an object inside or allegedly felt an object inside this package, you must have felt around a little bit to feel that package crinkle to know that the object was inside the cigarette pack, correct?
A. Yes, I did.
 Q. Okay. So, you lingered a little bit on Mr. Walker's pocket. It wasn't one of those sweeping motions that you were describing, you kind of had a break at his pockets?
 A. Yes, I did. When I got to his pocket and felt the object there it drew my attention to it. So, I felt it required a little bit more attention.
 Q. Okay. Now, that object could have been a rock, just a plain old ordinary rock that I would find outside, correct?
 A. I think once I felt it, once it drew my attention and I lingered there I was able to determine what it was. I did believe that it was a rock.
Q. But you didn't know for sure?
A. No, I couldn't visualize it.
 Q. Did it, as you say, determining that it was not a conventional rock, the known contraband variety you felt around that object and grasped it a little bit?
A. Yes, I did.
Q. You felt the contours of it.
A. Yes, I did.
 Q. In fact, you could describe the shape, if I asked you, couldn't you?
A. The general shape, yes, I could.
Q. Why don't you do that?
 A. It's generally round and hard, uneven edges to it.
 Q. Okay. And you were able to determine all of this from handling this object, manipulating this object on the outside of Mr. Walker's clothing, correct?
A. Yes.
 Q. So, there was really some hesitation in that area. I mean, you stopped and you focused on that and in terms of your sense of touch, for at least a few moments?
 A. Yes, like I said, while I was doing my pat down I felt the object in the pocket, wasn't immediately apparent to me what it was. I felt that I needed to spend more time it on (sic) and that is what I did.
 Q. So, your testimony is that it was not immediately apparent that that object was contraband?
 A. Nor was it immediately apparent that it was a weapon or not a weapon.
 Q. A moment ago you said that you did, paraphrasing, that you did hesitate because it was not immediately apparent what that object was.
A. Correct.
 Q. So, at that point in time you didn't know what it was at all?
 A. The first moment I felt it I did not know what it was.
 Q. So, at that point if (sic) time, given your state of knowledge at that precise moment, it could have been any type of thing, really.
A. Yes.
 Q. I mean physically, hard, semi round edged object?
 A. I didn't even determine that it was semi round at that point, just felt an object.
 Q. Okay. But again not to belabor it any more than I already have. At that point in time, you simply didn't know what it was, that you felt that you needed to handle it further to make a determination of what it was?
A. Yes, correct.
Id., at 16-19.
Officer Lane further testified:
 Q. * * * [T]he object that you felt in Mr. Walker's pocket in no way made you think it was a firearm of any sort, correct?
 A. When I immediately felt it, I had no idea what it was.
Q. Okay.
 A. Like the first moment that I felt it, I didn't have an impression of it. I felt there was an object in there.
 Q. But from the size or shape, sure didn't feel like a firearm did it.
 A. From my pat down sweeping motion, I didn't even really determine a size or shape necessarily. I just felt an object, something that was bulging, something identified that was something in his pocket. And I needed to determine if it was a weapon or not.
Q. But it was a small bulge, not a large bulge?
A. Yes.
Id., at 20.
Officer Lane also testified:
 Q. All right. And, Officer, defense counsel asked you a lot about when you found out what it was, did you figure out at the same time that it wasn't a weapon and it was a crime?
 A. Right. As I was determining that it was crack, I was also determining that I didn't believe it was a weapon.
 Q. All right. Officer, once you determined something isn't a weapon, do you stop your search at that point if it's not contraband?
 A. No, I don't. If I determine it's contraband, I pursue that.
 Q. Right. In this case you determined that it wasn't a weapon?
A. Correct.
 Q. And is that the same time, is that when you determined it was contraband?
A. Yes.
Id., at 27.
Officer Lane further testified:
 Q. Back to the statement that you made, when you made your determination that what you felt in Mr. Walker's pocket was not a weapon, you still didn't know at that precise moment that it was contraband?
* * *
 A. Like I told him, I believe it was simultaneous as I determined it wasn't a weapon I determined it was contraband.
 Q. When I was cross-examining you earlier, isn't it true that you in fact said that you didn't initially know what it was when you first felt it and you came back later and felt it further and made your determination that you believed it was contraband, isn't that a fair statement of what you said earlier today?
 A. Well, it's very close except I swept over it. I didn't have any idea what it was. I didn't come back later. It immediately caught my attention that I needed to determine what it was. I stayed there until I determined what it was.
 Q. Okay. Well, forgive me for not understanding. When I hear somebody say they swept over something it sounds like they passed over it and came back to touch it.
 A. No, that is not the case. As soon as I felt it, it drew my attention. I stopped until I felt comfortable that it wasn't a weapon, which is when I felt comfortable it was contraband.
 Q. But you earlier testified that you examined it, so to speak, on the outside of his clothing. You did feel it and move it around and manipulate it?
A. Yes, I did.
 Q. Because you even said that you heard, you felt the cigarette wrapper and heard a crinkle?
A. Yes. I did.
Id., at 29-30.
Officer Lane also testified at the continuation of the hearing on Walker's motion to suppress. The officer testified:
 Q. * * * When you patted down Mr. Walker did you feel an object on his person?
A. Yes, I did.
Q. Did you believe that object was a weapon.
 A. I didn't know. Initially I did not know until I checked it further.
 Q. All right. I understand that, Patrolman, but the question is a little different. Did you ever believe that object was a weapon?
A. I don't know. I didn't know if it was or not.
* * *
 Q. The object that you touched did not feel like a weapon to you, did it?
 A. When I initially touched it I didn't know what it felt like.
 Q. Well, at any point during the course of your touching or examination did it ever feel like a weapon to you?
 A. Initially it did not. And once I began checking it further, I was able to determine that it wasn't a weapon, so, no it did not feel like a weapon at that point.
 MR. ROHRKASTE: That is all the questions that I have, Your Honor.
 THE COURT: Okay. I'm not quite sure. Okay. You initially patted the person down.
THE WITNESS: Yes.
THE COURT: And you initially felt an object.
THE WITNESS: Yes.
 THE COURT: You're indicating at that time, you either knew it was not a weapon or you didn't know it was or what?
 THE WITNESS: I didn't know what it was. When I initially felt it I was unable to tell. I didn't have any information about what it was.
 THE COURT: And as you patted the individual down further, you made a determination that it was not a weapon.
 THE WITNESS: Correct. And at the same time I was able to determine —
 MR. ROHRKASTE: Objection to that last part of his answer. That is definitely unresponsive.
THE COURT: Overruled.
 THE WITNESS: And I was able to determine that it was contraband.
Transcript of Motion to Suppress Hearing, April 10, 1998, at p. 4-6.
Following the hearing, the trial court overruled Walker's motion to suppress the evidence of cocaine seized from Walker. The court stated:
 As to the actual pat down or frisk, the testimony was that the officer performed a sweeping motion over the Defendant. When he reached the pocket he felt the object in question which drew his attention.
 Initially, the officer did not know what it was and felt he needed to handle it further to make the determination if it was a weapon.
 He testified that once he determined it was not a weapon he simultaneously determined it was contraband.
 From the testimony, it is obvious to the Court that once he was able to determine that it was not a weapon, it was "immediately apparent" that it was contraband. State v. Stargell, 1995 WL 141468 (Ohio App. 2 Dist. 1995).
Judgment Entry, April 15, 1998, at 2.
After the trial court overruled his motion to suppress evidence, Walker entered a plea of no contest. The trial court accepted that plea, found Walker guilty, and eventually sentenced him to a three-year mandatory term of imprisonment. Walker filed a timely notice of appeal, and now presents a single assignment of error for our review.
 ASSIGNMENT OF ERROR THE TRIAL COURT ERRED IN OVERRULING THE MOTION TO SUPPRESS.
At a suppression hearing, the trial court serves as the trier of fact and must judge the credibility of witnesses and the weight of the evidence. State v. Fanning (1982), 1 Ohio St.3d 19,20. In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies upon the trial court's ability to assess the credibility of witnesses, and independently determines, "without deference to the trial court, whether the trial court has applied the appropriate legal standard." State v. Baker
(1997), 118 Ohio App.3d 654, 658, citing and quoting State v.Anderson (1995), 100 Ohio App.3d 688, 691.
We are, of course, mindful that the Supreme Court of the United States has held that "as a general matter, determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal." Ornelas v. U.S. (1996),517 U.S. 690, ___, 116 S.Ct. 1657, 1663. But the Supreme Court then added: "Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Id. We believe the standard of review set forth by the United States Supreme Court in Ornelas
is substantially the same as the one this court and other appellate courts in Ohio have traditionally used.
From the evidence presented, the trial court found that during the course of the pat-down of Walker, Officer Lane felt an object in Walker's coat pocket that drew his attention. Upon first feeling the object, Officer Lane did not know what it was. Officer Lane felt that he needed to handle the object further in order to determine whether it was a weapon. Upon further handling of the object, Officer Lane determined that it was not a weapon and simultaneously determined that the object was contraband. Although Officer Lane's testimony was at times ambiguous, the trial court's findings are nevertheless amply supported by the record and thus, as noted above, are to be accepted by this court on appellate review. The issue for our determination is whether under these circumstances, the seizure of the contraband violated Walker's Fourth Amendment right against unreasonable searches and seizures.
The United States Supreme Court has repeatedly stated that "searches and seizures 'conducted outside the judicial process, without prior approval by judge or magistrate, are per se
unreasonable under the Fourth Amendment — subject only to a few specifically established and well delineated exceptions.' "Minnesota v. Dickerson (1993), 508 U.S. 366, 372 (quoted citations omitted). Moreover, "[i]n a suppression hearing, the state bears the burden of proof and must demonstrate that the warrantless search and seizure were reasonable under the Fourth Amendment." State v. Bevan (1992), 80 Ohio App.3d 126, 129.
In Terry v. Ohio (1968), 392 U.S. 1, the United States Supreme Court recognized an exception to the Fourth Amendment's general requirement that searches be conducted pursuant to a warrant. In Terry, the Supreme Court stated that the "central inquiry under the Fourth Amendment" is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." Id., at 19. In assessing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" Id., at 21-22.
In Terry, the Court upheld a police officer's "stop and frisk", or pat-down search, of individuals suspected of potential criminal activity. The Court stated:
 [W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.
Id., at 24.
"A search for weapons in the absence of probable cause to arrest, however, must, like any other search, be strictly circumscribed by the exigencies which justify its initiation. * * * Thus it must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby, and may realistically be characterized as something less than a 'full' search, even though it remains a serious intrusion." Id., at 25-26 (citation omitted). Accordingly, a Terry search "must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Id., at 29. In short, "[t]he purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence. . . ." Adams v.Williams (1972), 407 U.S. 143, 146.
In Minnesota v. Dickerson, supra, the Supreme Court addressed the question of "whether police officers may seize nonthreatening contraband detected during a protective patdown search of the sort permitted by Terry." Id., at 373. The Court concluded "that they may, so long as the officers' search stays within the bounds marked by Terry." Id.
In reaching its conclusion in Dickerson, the Court analogized to the "plain-view" exception to the warrant requirement. The Court stated:
 If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.
Id., at 375-376.
The record in Dickerson reflected that "the officer conducting the search ascertained that the lump in respondent's jacket was contraband only after probing and investigating what he certainly knew was not a weapon." Id., at 371. That is, "the officer determined that the lump was contraband only after 'squeezing, sliding and otherwise manipulating the contents of the defendant's pocket' — a pocket which the officer already knew contained no weapon." Id., at 378. Under those circumstances, the Court concluded that the search and seizure of the contraband was constitutionally invalid. The Court stated:
 Here, the officer's continued exploration of respondent's pocket after having concluded that it contained no weapon was unrelated to "[t]he sole justification of the search [under Terry:] . . . the protection of the police officer and others nearby." 392 U.S., at 29. It therefore amounted to the sort of evidentiary search that Terry expressly refused to authorize, see id., at 26, and that we have condemned in subsequent cases.
Id., at 378.
In State v. Evans (1993), 67 Ohio St.3d 405, a police officer conducted a pat-down search of an individual he had stopped for a traffic violation. In conducting the pat-down, the officer felt a large bulk in the defendant's left front pocket that felt like a rock substance. The officer reached his hand in the pocket and removed a large wad of money on top of which was a small packet of crack cocaine. The defendant was then arrested and subsequently indicted for, inter alia, various drug violations. At a hearing to suppress the evidence seized by the officer, the officer testified that he did not know whether the object he felt was a weapon. The officer conceded that he knew the object was not a gun, but further stated that he was unable to conclude that the object was not a knife.
The Ohio Supreme Court concluded that the issue raised by these facts concerned what future actions are permissible underTerry when the searching police officer is unable to determine from his pat-down that the suspect is not carrying a weapon. The court then instructed:
 In answering this question, it is important first to emphasize that Terry does not require that the officer be absolutely convinced that the object he feels is a weapon before grounds exist to remove the object. At the same time, a hunch or inarticulable suspicion that the object is a weapon of some sort will not provide a sufficient basis to uphold a further intrusion into the clothing of a suspect. When an officer removes an object that is not a weapon, the proper question to ask is whether that officer reasonably believed, due to the object's "size or density," that it could be a weapon. 3 LaFave, Search and Seizure (2 Ed. 1987) 521, Section 9.4(c).
 "Under the better view, then, a search is not permissible when the object felt is soft in nature. If the object felt is hard, then the question is whether its 'size or density' is such that it might be a weapon. But because 'weapons are not always of an easily discernible shape,' it is not inevitably essential that the officer feel the outline of a pistol or something of that nature. Somewhat more leeway must be allowed upon 'the feeling of a hard object of substantial size, the precise shape or nature of which is not discernible through outer clothing,' which is most likely to occur when the suspect is wearing heavy clothing." (Footnotes omitted.) Id. at 523.
Id., at 415.
The Ohio Supreme Court then concluded that because it was reasonable for the officer to believe that the object could be a weapon, he did not exceed the scope of a Terry search when he reached into the defendant's pocket to retrieve it. Because the officer was unable to determine that the object was not a knife or other weapon, he was entitled to remove it. Id., at 415-416. The court thus held:
 When an officer is conducting a lawful pat-down search for weapons and discovers an object on the suspect's person which the officer, through his or her sense of touch, reasonably believes could be a weapon, the officer may seize the object so long as the search stays within the bounds of Terry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.
Id., at paragraph two of the syllabus.
In State v. Oborne (1994), 99 Ohio App.3d 577, we addressed the permissible scope of a Terry search. We stated:
 Unless probable cause and exigent circumstances exist, once the officer determines that the object detected in the outer clothing of the suspect is not a weapon, the search must stop. Minnesota v. Dickerson (1993), 508 U.S. 366, ___, 113 S.Ct. 2130, 2137, 124 L.Ed.2d 334, 345-346; State v. Evans (1993), 67 Ohio St.3d 405, 414, 618 N.E.2d 162, 170, certiorari denied (1993), 510 U.S. 1166, 114 S.Ct. 1195, 127 L.Ed.2d 544. If the officer is unable to determine during the pat-down whether the object is a weapon, the officer may reach into the pocket and remove the object in order to examine the object visually to determine whether it is a weapon. Dickerson at ___, 113 S.Ct. at 2136, 124 L.Ed.2d at 344; Evans, supra, paragraph two of the syllabus.
 Once the officer has visually examined the object and concludes that it is not a weapon, that it does not contain a weapon, and that it is not obviously contraband, then the officer's justification for conducting a limited frisk for weapons is dissipated, and the officer may not then search for evidence or contraband, generally, without probable cause and exigent circumstances. State v. Chatton (1984), 11 Ohio St.3d 59, 63, 11 OBR 250, 253-254, 463 N.E.2d 1237, 1240-1241, certiorari denied (1984), 469 U.S. 856, 105 S.Ct. 182, 83 L.Ed.2d 116.
Id., at 581-582.
We believe that an application of the principles set forth in the foregoing cases compels the conclusion that Officer Lane's manipulation of the object he detected in Walker's coat pocket and subsequent seizure of that object did not violate Walker's right to be free from unreasonable searches and seizures. Measured by an objective standard, we believe that the facts available to Officer Lane would " 'warrant a man of reasonable caution in the belief' that the action taken was appropriate."Terry, supra, at 21-22.
Walker arrived at a location where Officer Lane and other police officers were conducting a search pursuant to a warrant. Drug activity had been suspected at the premises being searched. The officers had information that Walker would arrive at the premises and that he may be carrying a weapon. Walker does not challenge on appeal the right of Officer Lane to conduct a pat-down search of him, but rather, argues that the scope of a permissible Terry pat-down was exceeded.
Officer Lane conducted a pat-down of Walker's outer clothing. When he reached a lower outside jacket pocket, he felt a hard object that made a small bulge and that drew his attention. His initial touching of the object did not permit Officer Lane to make an immediate definitive determination as to whether the object was or was not a weapon. Faced with information that Walker could possibly be carrying a weapon, it was not unreasonable for Officer Lane to want to exclude the possibility that the object he detected in Walker's outside coat pocket was a weapon.
The very purpose of the warrantless search permitted byTerry is to allow a police officer to protect himself and to pursue his investigation without fear of violence. See Terry,supra, at 24; see also, Adams, supra, at 146. The investigating officer is authorized "to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." Terry, supra, at 24 (emphasis added). Given this purpose, we see nothing unreasonable in permitting an officer to make a further tactile examination of an unknown object through an individual's outer clothing in order to assure himself that the individual is not carrying a weapon. That further tactile examination of the unidentified object does not constitute any further significant invasion of an individual's privacy not already authorized by the initial pat-down itself.
Indeed, it would be anomalous to permit an officer to conduct a pat-down search for weapons in order to protect himself, but to preclude the officer from taking further limited steps to effectuate that purpose when the initial pat-down proves inconclusive. In short, Terry does not require an officer to ignore an object at his potential peril simply because the officer is unable to determine that the object is a weapon upon first touching it. "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." Id., at 23.
We also note that, as suggested in Evans, supra, at 415, an officer must be given more leeway when the object is detected through heavy clothing. Here, the defendant was wearing a black leather jacket, making the identity of the object more problematic upon an initial touch. Moreover, the object was detected in an outside lower pocket, making it easily accessible to the defendant if it had turned out to be a weapon. Arguably, under Evans and Oborne, supra, Officer Lane would have been justified in simply reaching into Walker's coat pocket and retrieving the unknown object upon first touching it in order to visually examine it to determine whether it was, in fact, a weapon. However, Officer Lane took an even more limited, less intrusive step. When he was uncertain as to the object's identity, he simply grasped the object further and manipulated it through Walker's outer clothing. As in Terry, we believe the record here "evidences the tempered act of a policeman who in the course of an investigation had to make a quick decision as to how to protect himself and others from possible danger, and took limited steps to do so." Terry,supra, at 28.
Upon this further manipulation of the object, Officer Lane was able to conclude that the object was not a weapon. He simultaneously concluded that the object was contraband. Thus, while still within the scope of a permissible Terry search, it became immediately apparent to Officer Lane that the object he detected in Walker's pocket was contraband. As a result, Officer Lane's subsequent seizure of the contraband was permitted, rather than prohibited, by Minnesota v. Dickerson,supra.
In sum, on the record here, we believe that the seizure of the crack cocaine from Mr. Walker did not violate his constitutional right to be free from unreasonable searches and seizures. Accordingly, the trial court did not err in overruling Walker's motion to suppress evidence.
Walker's sole assignment of error is overruled.
 CONCLUSION
Having overruled the defendant's single assignment of error, the judgment of the trial court will be affirmed.
BROGAN, J. and FAIN, J., concur.
Copies mailed to:
Robert K. Hendrix Victor A. Hodge Hon. Thomas M. Rose